```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

NATIONAL UNION FIRE INSURANCE      :
COMPANY OF PITTSBURGH, PA,
                                   :   12 Civ. 1505 (AT)(HBP)
              Plaintiff,
                                   :   OPINION
    -against-                          AND ORDER
                                   :
H&R BLOCK, INC., et al.,
                                   :
              Defendants.
                                   :
----------------------------------X
```

PITMAN, United States Magistrate Judge:

I.  Introduction

        I write to resolve the parties' lingering dispute concerning defendant's[1] requests for certain reserve information. For the reasons set forth below, defendant's request for reserve information is granted.

II.  Facts

        This action arises out of a dispute concerning whether an insurance policy issued by plaintiff in favor of Tax Group

---

[1] The action was originally commenced against H&R Block, Inc., HRB Tax Group, Inc. and H&R Block Tax Services LLC. Pursuant to an agreement among the parties, H&R Block, Inc. and H&R Block Tax Services LLC have been dismissed from the action. HRB Tax Group, Inc. ("Tax Group") is the sole remaining defendant.

covered claims asserted against Tax Group in an action brought
under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and
certain parallel state statutes.  Plaintiff National Union Fire
Insurance Company of Pittsburgh, PA ("National Union") issued a
commercial umbrella general liability insurance policy in favor
of Tax Group with an effective period of May 10, 2010 through May
1, 2011 (Amended Complaint, dated Mar. 29, 2012 (Docket Item 6)
("Am. Compl.") ¶ 10).  Among other things, the policy provided
coverage for personal injury and advertising injury, both of
which were defined in the policy (Am. Compl. ¶¶ 11-14).  The
policy also contained provisions requiring Tax Group to provide
National Union with prompt notice of any claims and to cooperate
with National Union concerning the investigation, settlement of
defense of any claim (Am. Compl. ¶ 18).  The policy also excluded
certain types of claims from the definition of personal injury
and advertising injury (Am. Compl. ¶ 19).

On or about January 31, 2011, Jackson Hewitt Inc.
("Jackson Hewitt") commenced an action against Tax Group and its
affiliates, Jackson Hewitt Inc. v. H&R Block Tax Servs. L.L.C.,
11 Civ. 641 (AKH) (S.D.N.Y.) (the "Underlying Action"), alleging
that certain of Tax Group's advertisements falsely represented
that Tax Group's tax preparation services were superior to those
provided by Jackson Hewitt (Am. Compl. ¶¶ 20-22).

As a result of both Tax Group's alleged failure to cooperate and National Union's contention that the claims in the Underlying Action were excluded from the policy's definitions of personal injury and advertising injury, National Union seeks in this action a declaration that it has no obligation to indemnify Tax Group in connection with either the settlement of or the defense costs incurred in connection with the Underlying Action.

Tax Group disputes both its alleged failure to cooperate and National Union's contention that the claims in the Underlying Action were excluded from the policy.  Tax Group alleges that National Union is guilty a "vexatious refusal to pay," (Answer and Counterclaims, dated June 28, 2013 (Docket Item 42) ("Counterclaims") ¶ 1[2]).  Tax Group claims, in substance, that it provided National Union with all the information that it could provide concerning the Underlying Action, but that it was unable to provide additional information due to National Union's ultimate refusal to sign the protective order that was entered in the Underlying Action and a common interest agreement.  In response to a request from Tax Group for National Union's posi-

---

[2]Although Tax Group's answer and counterclaims are contained in one document, it has numbered the paragraphs of its answer and counterclaims separately, i.e., the paragraph numbering of Tax Group's counterclaims begin again with number 1.  Unless indicated otherwise, all references to paragraphs in Tax Group's pleading refer to the counterclaims.

tion concerning coverage, National Union advised Tax Group on November 21, 2011 that it "purported to reserve rights to deny coverage on various grounds . . . ." (Counterclaims ¶ 26).  Tax Group alleges that although discussions between it and National Union continued after National Union's November 21, 2011 letter, National Union continued to refuse to agree to the protective order in the Underlying Action and the proposed common interest agreement (Counterclaims ¶¶ 27-32).

In December 2011, Tax Group began having discussions with Jackson Hewitt concerning the possibility of settling the Underlying Action (Counterclaims ¶ 33).  Tax Group alleges that as a result of National Union's unreasonable and ongoing refusal to be bound by the protective order and the common interest agreement, it was unable to share with National Union all the information concerning the settlement discussions that it other-wise would have been able to share, and that National Union refused to consent to any of the settlement proposals being discussed (Counterclaims ¶¶ 34-36).  According to Tax Group, National Union instead accused Tax Group of failing to cooperate with it (Counterclaims ¶ 37).

On February 23, 2012, Tax Group and Jackson Hewitt entered into a confidential settlement and on February 24, 2014, the Underlying Action was dismissed (Counterclaims ¶ 38).

4

National Union commenced this declaratory judgment action five
days later on February 29, 2012 (Counterclaims ¶ 39).  In its
counterclaims, Tax Group seeks, among other things, (1) a decla-
ration that the claims in the Underlying Action are covered by
the policy in issue, (2) the expenses it incurred in connection
with the defense and settlement of the Underlying Action, (3)
statutory damages under Missouri law and (4) its attorneys' fees.

III.  Analysis

        Tax Group seeks "[a]ll documents that refer or relate
to any reserve amounts that have been set for, relating to, or
regarding the Underlying Action . . ." (Letter of Edward Tessler,
Esq., to the undersigned, dated Apr. 4, 2014, at 2).
Tax Group argues that discovery of reserve information is appro-
priate to test National Union's argument that it lacked suffi-
cient information to value the claims in the Underlying Action
and that the information is also relevant to its assertion that
National Union refused to pay in bad faith.  Tax Group's argument
appears to be that National Union's establishing a reserve
implies that it had sufficient information to value Jackson
Hewitt's claims against Tax Group.  National Union opposes the
production, arguing that the information may be subject to the

attorney-client privilege and/or the work product doctrine and
that it is irrelevant to the issue of coverage.

      To the extent National Union asserts the attorney-
client privilege and work-product protection, its argument is
unavailing.  Although a number of courts have noted that reserve
information may be protected by these privileges, Lava Trading,
Inc. v. Hartford Fire Ins. Co., 03 Civ. 7037 (PKC)(MHD), 2005 WL
66892 at *2 (S.D.N.Y. Jan. 11, 2005) (Dolinger, M.J.); In re
Pfizer Inc. Secs. Litig., 90 Civ. 1260 (SS)(NRB), 1994 WL 263610
at *1-*2 (S.D.N.Y. June 6, 1994) (Buchwald, M.J.), it is beyond
question that the party asserting the attorney-client privilege
or work-product protection bears the burden of proving the
applicability of either privilege.  von Bulow v. von Bulow, 811
F.2d 136, 144 (2d Cir. 1987), citing In re Grand Jury Subpoena
dated January 4, 1984, 750 F.2d 223, 224 (2d Cir. 1984); accord
McNamee v. Clemens, No. 09 CV 1647 (SJ)(CLP), 2014 WL 1338720 at
*4 (E.D.N.Y. Apr. 2, 2014); Chen-Oster v. Goldman, Sachs & Co.,
293 F.R.D. 547, 554 (S.D.N.Y. 2013) (Francis, M.J.); Bowne of
N.Y.C. Inc. v. AmBase Corp., 150 F.R.D. 465, 470 (S.D.N.Y. 1993)
(Dolinger, M.J.) (collecting cases).  "Th[is] burden is not, of
course, discharged by mere conclusory or ipse dixit assertions .
. . ."  In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965), accord

In re Grand Jury Subpoena dated July 6, 2005, 256 F. App'x 379,
382 (2d Cir. 2007).

      Although the parties have proceeded by way of letter
briefs in lieu of formal motion practice, National Union has not
even proffered any facts suggesting the involvement of counsel in
the establishment of reserves with respect to the Underlying
Action.  All that National Union has done is cited other cases
that have recognized that reserve information may be protected by
the attorney-client privilege or work-product doctrine.  It makes
no representation whatsoever that counsel was actually involved
in the decision to set up reserves for the Underlying Action.

      The applicability of either attorney-client or work-
product protection is necessarily a factually specific inquiry.
The fact that other insurers in other cases have consulted with
counsel in the setting of reserves does not provide any basis for
drawing a conclusion as to the methodology National Union used
with respect to the specific reserve decisions in issue here.
Because National Union has not proffered any facts establishing
that either the attorney-client privilege or the work-product
doctrine is applicable to the reserve information in issue, there
is no basis to preclude discovery on the basis of either of these
doctrines.

The issue of relevance presents a more difficult issue, as evidenced by the fact that Judges in this District have reached conflicting conclusions concerning the relevance of reserve information.  Champion Int'l Corp. v. Liberty Mut. Ins. Co., 128 F.R.D. 608, 612 (S.D.N.Y. 1989) (Conner, D.J.); Stonewall Ins. Co. v. Nat'l Gypsum Co., 86 Civ. 9671 (SW), 1988 WL 96159 at *5 (S.D.N.Y. Sept. 6, 1988) (Kram, D.J.).

The most relevant factors concerning National Union's potential liability in this action are the terms of the policy and the conduct of National Union and Tax Group during the pendency of the Underlying Action.  Whatever reserve National Union may have established cannot alter the policy's definition of advertising injury or personal injury nor can it alter the nature and amount of information Tax Group provided to National Union concerning the Underlying Action.  In addition, the probative value of the reserve information as an aid to the interpretation of possibly ambiguous policy language is attenuated by the fact that there are no certainties in litigation.  Regardless of the strength or weakness of an insured's claim for coverage, I suspect that there are very few cases in which the probability that the insured will succeed on its coverage claim can be valued at zero.  Thus, the establishment of a reserve may merely reflect a prudent insurer's recognition of the risks of inherent in

8

litigation rather than an admission of coverage or liability.
See Fid. & Deposit Co. v. McCulloch, 168 F.R.D. 516, 525 (E.D.
Pa. 1996) ("In short, setting aside reserves does not amount to
an admission of liability."); Ann F. Ketchen, "Reserve & Reinsur-
ance Information:  Is It Discoverable?," 38 Brief 40, 40 (Spring
2009) ("Ketchen") ("With regard to loss reserves, insurers argue
that the number merely represents a worse case scenario, which
has no bearing on the legal claims . . . .").

On the other hand, the establishment of a reserve does
have some probative value, especially where, as here, a bad faith
refusal to pay is alleged.  As the Honorable James Cott, United
States Magistrate Judge, observed in Fireman's Fund Ins. Co. v.
Great Am. Ins. Co., 284 F.R.D. 132, 138-39 (S.D.N.Y. 2012):

> [W]hile [defendant] cites several cases for the propo-
> sition that reserve information is "generally irrele-
> vant in insurance coverage actions" . . ., its position
> is belied by several more recent decisions considering
> facts more analogous to the dispute between Max and
> Signal.  For example, in U.S. Fire Insurance Co. v.
> Bunge North America, Inc., 244 F.R.D. 638, 645 (D. Kan.
> 2007), the court observed that document requests seek-
> ing reserve information should be evaluated on a
> case-by-case basis and found that "the actual amounts
> of the Insurers' loss reserves -- including any changes
> to those amounts -- could, at the least, lead to admis-
> sible evidence relating to the Insurers' own beliefs
> about coverage and their liability, as well as their
> good or bad faith in handling and investigating [the
> insured's] claims." Likewise, in Bernstein v. The
> Travelers Ins. Co., 447 F. Supp. 2d 1100, 1107 (N.D.
> Cal. 2006), the court acknowledged that the amounts at
> which an insurer sets reserves show "what [the insurer]

9

actually knew and thought, and what motives animated its conduct" and thus are "critical areas of inquiry in bad faith cases" and are "fully fair game for discovery." Accord Nicholas v. Bituminous Cas. Corp., 235 F.R.D. 325, 328-29 (N.D. W. Va. 2006).

The court in Groben v. Travelers Indemnity Co., 49 Misc. 2d 14 16-17, 266 N.Y.S.2d 616, 619 (Sup. Ct. Oneida Co. 1965) reached a similar result, stating:

> There is included in the proposed notice a request for production of material concerning the reserve established by the insurer and correspondence with the Insurance Department of the State in respect to it. Presumably, these items could be material and necessary to the action as an admission against interest as to defendant's knowledge and evaluation of the case. It can be argued that this was an internal matter of the insurer not related to the preparation of the legal defense of the actions. However, examination with respect to the reserve may develop evidence on the issue of defendant's bad faith. Bad faith is a state of mind which must be established by circumstantial evidence. The actions of defendant in respect to the reserve are relevant. Negligent investigation and uninformed evaluation of the worth of the Rosen claims go to the heart of the case since serious and recurring negligence can be indicative of bad faith. Defendant's actions on the reserve may have a direct bearing on the issue.

See also Granite State Ins. Co. v. Clearwater Ins. Co., 09 Civ. 10607 (RKE), 2012 WL 1520851 at *3 (S.D.N.Y. Apr. 30, 2012) (Eaton, J. (Ct. Int'l Trade)) ("Reports and analyses regarding Granite State's reserve procedures are directly relevant to its defense that Granite State acted in bad faith by not having adequate and reasonable reserve procedures in place."); Am. Prot.

Ins. Co. v. Helm Concentrates, Inc., 140 F.R.D. 448, 449-50 (E.D. Cal. 1991) ("In considering whether an insurer acted in bad faith in denying its duty to defend under a 'third party' liability policy the fact that it established a reserve, particularly for litigation costs, is probative on the issue of whether there is a 'potential for liability.'  Thus when an insurer, by its actions, acknowledges the potential for liability and fails to attempt to settle a claim against its insured and/or fails to defend, reserve information is relevant to the issue of good faith."); Champion Int'l Corp. v. Liberty Mut. Ins. Co., supra, 128 F.R.D. at 612 (noting that reserve information has "sufficient relevance in coverage cases to justify its production absent the existence of an attorney-client privilege, the applicability of the work-product exemption, or the greater burden posed by production."); Ketchen, supra, 38 Brief at 42 ("[C]ourts more often allow the discovery of reserve information in third-party claims when there is a question of whether the insurer's failure to settle a claim against its insured and/or the insurer's failure to defend the insured was in bad faith.").[3]

---

[3]Additional cases reaching the same result on similar reasoning include Culbertson v. Shelter Mut. Ins. Co., No. Civ. A. 97-1609 & -1969, 1998 WL 743592 at *1 (E.D. La. Oct. 21, 1998) (reserve information is discoverable where claim of bad faith is made against defendant-insurer); Athridge v. Aetna Cas. & Sur.
(continued...)

Bearing in mind that relevance for the purposes of discovery is broader than relevance for the purposes of admissibility, I conclude that the reserve information sought here is sufficiently relevant to be discoverable.  If National Union was able to perform a detailed analysis of Jackson Hewitt's claims against Tax Group, identifying all the pertinent legal and factual issues, it would tend to disprove National Union's claim that it lacked sufficient information to evaluate the claims against Tax Group.  On the other hand, if National Union's reserve analysis was sketchy and incomplete, it would tend to support National Union's position.  Although I express no opinion as to the ultimate admissibility of the reserve information, I do conclude that it is sufficiently relevant to be discoverable.

IV.  Conclusion

Accordingly, for all the foregoing reasons, National Union's objections to Tax Group's request for reserve information are overruled and Tax Group's application to compel production is granted.  National Union is directed to provide the reserve

---

[3](...continued)
Co., 184 F.R.D. 181, 192-93 (D.D.C. 1998) (same); Savoy v. Richard A. Carrier Trucking, Inc., 176 F.R.D. 10, 12 (D. Mass. 1997) (same); N. River Ins. Co. v. Greater N.Y. Mut. Ins. Co., 872 F. Supp. 1411, 1412 (E.D. Pa. 1995).

information requested within fourteen (14) days of the date of

this Order.

Dated:   New York, New York
         September 4, 2014

                                        SO ORDERED

                                        _____
                                        HENRY PITMAN
                                        United States Magistrate Judge

Copies transmitted to:

Mark D. Sheridan, Esq.
Patton Boggs LLP
6th Floor
One Riverfront Plaza
Newark, New Jersey  07102

Edward Tessler, Esq.
Dickstein Shapiro LLP
1633 Broadway
New York, New York  10019-6708